**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 1:22-cr-20571-JEM/Becerra

UNITED STATES OF AMERICA,

v.

JOSE HUGO ESTUPINAN, *et al.*,

    Defendants.

_____/

### REPORT AND RECOMMENDATION ON MOTION TO DISMISS INDICTMENT

   **THIS CAUSE** came before the Court on Defendant Jose Hugo Estupinan's Motion to Dismiss Indictment, which Defendants Ramon Gabriel Bautista-Feliciano and Alcibiades Jimenez-Flores have adopted. *See* ECF Nos. [29], [32], [33]. The Honorable Jose E. Martinez referred the Motion to the undersigned for a report and recommendation. *See* ECF No. [34]. The United States has filed a Response to the Motion, ECF No. [37]. Estupinan filed two Supplemental Memoranda in support of his Motion to Dismiss, ECF Nos. [39], [44], to which the Government filed a response, ECF No. [48].

   The Parties appeared before the undersigned for an evidentiary hearing (the "Hearing"). *See* ECF No. [40]. The Government called two witnesses at the Hearing: (1) United States Coast Guard Lieutenant Connor Ives, and (2) U.S. Drug Enforcement Administration ("DEA") Special Agent Brian Smith. Both witnesses were subject to cross examination.

   After careful consideration of the Motion, the evidence presented at the Hearing, the argument of counsel, the pertinent portions of the record, and being otherwise fully advised in the premises, it is **RECOMMENDED** that Defendants' Motion to Dismiss Indictment, ECF No. [29], be **DENIED**.

## I.      BACKGROUND AND FACTUAL FINDINGS

Defendants are charged by Indictment with conspiracy to possess with intent to distribute, and possession with intent to distribute, five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of the Maritime Drug Law Enforcement Act ("MDLEA").  *See* ECF No. [15].  Based on the record, including the testimony from Lieutenant Ives and Special Agent Smith which the Court found credible, the undersigned makes the following findings for purposes of adjudicating the instant Motion.

On October 2, 2022, law enforcement encountered Defendants on board a go-fast vessel ("GFV") approximately 190 nautical miles southwest of La Romana, Dominican Republic.  *See* ECF No. [1] at ¶¶ 3-4.  A marine patrol aircraft observed the GFV and suspected that it was transporting narcotics.  *See* ECF No. [49] at 51:21-52:5.  The *USS Wichita*, a U.S. Navy vessel, was diverted to interdict and investigate.  *See* ECF No. [1] at ¶ 3.  The *Wichita* launched its helicopter and a rigid hull inflatable boat with a boarding team from the U.S. Coast Guard.  *Id.*; *see also* ECF No. [49] at 50:17-21.  The Coast Guard deploys tactical response law enforcement teams on Navy ships to carry out law enforcement operations, which is one of the Coast Guard's primary missions in the Caribbean.  ECF No. [49] at 12:22-25.

The GFV did not comply with warning shots from the helicopter, and disabling shots were thereafter fired which rendered the GFV dead in the water. *See* ECF Nos. [1] at ¶ 3; [49] at 52:19-53:1.  The Coast Guard team boarded the GFV in order to determine the nationality of the vessel.  *See* ECF No. [49] at 53:14-25.  Defendants were the only persons on board the GFV, and none identified themselves as the master nor made a claim of nationality for the vessel.  *See* ECF No. [1] at ¶ 4.  As such, the Coast Guard law enforcement team treated the GFV as a vessel without nationality, subject to the jurisdiction of the United States.  *Id.*  Ion scans were done to test for the

presence of illicit substances on Defendants' hands and the GFV, which came back presumptively positive. *See* ECF No. [49] at 9-16. Law enforcement seized twenty-two bales from the GFV and surrounding waters weighing approximately 704 kilograms, which field tested positive for cocaine. *See* ECF No. [1] at ¶ 5.

The Coast Guard took Defendants into custody based upon probable cause to believe that Defendants committed a drug trafficking crime. ECF No. [49] at 54:9-23. Specifically, on October 2, 2022, Defendants were taken on board the *Wichita*. *See* ECF Nos. [1] at ¶ 5; [49] at 16:22-17:5. However, Defendants did not make an Initial Appearance before this Court until November 14, 2022. *See* ECF Nos. [2], [3], [4].

**A. The Government's Decision to Prosecute Defendants In This District**

The decision as to *where* Defendants will be prosecuted, referred to as "disposition," is a decision made by the Department of Justice ("DOJ") without input from the Coast Guard. *See* ECF No. [49] at 16:1-13. According to the testimony presented to the Court, once the DOJ determines the district of disposition, the Coast Guard has written guidance which instructs the Coast Guard to bring detainees as expeditiously as possible to the district of disposition, or to a district where they can thereafter be transported to the district of disposition. *Id.* at 111:20-25. Because the Coast Guard does not "maintain custody [of detainees] over land," once a Coast Guard vessel arrives in port, the Coast Guard must rely on other federal agencies to transport the detainees to the district where they are being prosecuted, and to maintain custody over the detainees until transportation arrives. *Id.* at 67:12-25, 76:6-12, 110:19-111:2.

Two days after they were first apprehended, on October 4, 2022, the DOJ notified the Coast Guard that Defendants would be prosecuted in the Southern District of the Florida. *Id.* at 16:1-9, 17:5-18. However, at that time, the *Wichita* could have reached Puerto Rico in approximately

three days.  *Id*. at 86:9-19.  If they had been taken to port in Puerto Rico, Defendants could have

been presented before a Magistrate Judge in the United States District Court in Puerto Rico for

their initial appearance.  Why Defendants were not taken to Puerto Rico is, at best, still unclear.

Lieutenant Ives testified that the *Wichita* "could have potentially pulled into Puerto Rico" but did

not "because that was not the port of disposition" and it "was not logistically possible."  *Id*. at

64:3-7, 81:2-5.  When the Court specifically asked why it was not logistically possible, Lieutenant

Ives stated that:

> So the ask was made for an aircraft.  We do this every time.  This is
> like blanket practice.   Is an aircraft available to make the
> transportation either out of Guantanamo Bay or out of somewhere
> in Puerto Rico.  Sometimes it's a yes and then we make it happen.
> Most of the time it is a no.
>
> *****
>
> That request usually goes to DEA, and we try to coordinate with our
> … Regional Coordinating Mechanism.

*Id*. at 64:10-18.  Lieutenant Ives further testified that had the *Wichita* gone to Puerto Rico, it would

not have "go[ne] over well" because the local Coast Guard would need to coordinate with the DEA

to take custody of Defendants, and the DEA "would have to drop everything" to decide whether it

was logistically feasible to assume custody in the Port of Ponce.  *Id*. at 62:4-10, 65:5-21.  The

Government did not offer any evidence as to why an aircraft was not available.  Indeed, the

testimony strongly suggested that other than making "the ask" for an aircraft, disembarking

Defendants in Puerto Rico was not an option that was seriously considered.

Although it would have taken the *Wichita* approximately *five* days to reach Miami, Florida

from the location of interdiction, a distance of 1,200 nautical miles, *id*. at 15:3-7, 38:21-39:10, it

took *forty-three* days from the time of interdiction for Defendants to be presented before a United

States Magistrate Judge.  As described in more detail below, the delay here was not a result of any

4

emergency or unusual event, and was not a result of the Coast Guard vessels not otherwise being scheduled to come to a U.S. port.  Instead, as noted in detail below, Defendants were transferred to different Coast Guard ships no less than *eight* times, each of these transfers occurring at sea within miles from the territory of the United States.

**B.  The First Transfer: From the *USS Wichita* To the *USCGC Northland***

The *Wichita* experienced partial engine failure shortly after the interdiction.  *Id*. at 19:14-19.  Although the Port of Ponce, Puerto Rico is "where the Navy typically effects repairs," i*d*. at 60:18-19, the *Wichita* went to the U.S. naval base at Guantanamo Bay, Cuba for repairs.  *Id*. at 19:14-19.  Because of the engine failure, it traveled at a significantly reduced speed toward the southern part of the Windward Pass.  *Id*.  Before reaching Guantanamo Bay, Defendants were transferred in the Windward Pass from the *Wichita* to a Coast Guard cutter, the *USCGC Northland*, on October 7, 2022.  *Id*. at 19:22-25, 86:22-25.  After transferring Defendants, the *Wichita* continued on and reached Guantanamo Bay, approximately 60 nautical miles from the point of transfer, the same day.  *Id*. at 87:19-88:8.

It is unclear on this record why Defendants were not taken to Guantanamo Bay.  Lieutenant Ives testified that because the Coast Guard does not use aircraft to transport detainees, *id*. at 60:5-6, 79:20-80:2, the Coast Guard requests assistance from other law enforcement agencies to transport a detainee once they arrive in port.  *Id*. at 64:10-15.  According to Lieutenant Ives, it is against policy for a Coast Guard cutter to pull into Guantanamo Bay with detainees on deck unless the Coast Guard transfers custody in Guantanamo Bay to another agency, and that agency transports the detainees to the United States.  *Id*. at 43:11-14.  The evidence established that the Coast Guard has previously brought detainees to Guantanamo Bay "on the very rare occasion that an agency can provide a flight out of Guantanamo Bay…," which occurred within the last year.

*Id*. at 40:19-21.  However, that was not done here and there is no evidence in the record regarding whether that request was made and what response, if any, the Coast Guard received.  In short, for this and every transfer thereafter off of Guantanamo Bay, the Government failed to provide any evidence that other agencies were contacted and were unavailable to assist in taking Defendants from Guantanamo Bay to the Southern District of Florida.

### C.  The Second Transfer: From *USCGC Northland* To *USCGC Joseph Doyle*

The *Northland* remained in the Windward Pass to continue with another of the Coast Guard's missions, migrant interdiction.  *Id*. at 12:21-25, 20:23-21:3.  The Coast Guard required four cutters, including the *Northland*, to be present in the Windward Pass because of the current migrant crisis.  *Id*.  The Coast Guard planned to transfer Defendants to the first cutter that was slated to leave the Windward Pass and travel to South Florida.  *Id*. at 20:19-21.

However, on October 11, 2022, four days after Defendants were taken on board, the *Northland* suffered partial engine failure and needed to go to Guantanamo Bay for repairs.  *Id*. at 21:4-9.  Instead of taking the Defendants to Guantanamo Bay, Defendants were again transferred in the Windward Pass, this time to *USCGC Joseph Doyle*.  *Id*.  Hours after transferring Defendants to the *Joseph Doyle*, the *Northland* arrived in Guantanamo Bay, approximately eighty or ninety nautical miles from the point of transfer.  *Id*. at 89:2-15.  No evidence was presented as to whether the Coast Guard requested that the DEA or any other agency take custody of Defendants in Guantanamo Bay.

### D.  The Third Transfer: From *USCGC Joseph Doyle* Back To *USCGC Northland*

The *Joseph Doyle* remained in the Windward Pass, as it too was part of the required team of cutters that patrolled the area for Haitian migrants in need of rescue.  *Id*. at 21:12-14.  However, the *Joseph Doyle* did not have the manpower necessary to adequately supervise detainees.  *Id*. at

21:18-22:6.   As a result, five days after taking Defendants onboard, on October 16, 2022, Defendants were transferred in the Windward Pass back to the *Northland*, which had finished its repairs.  *Id*. at 21:20-22, 22:7-17.  Within a day of the transfer, the *Joseph Doyle* pulled into Guantanamo Bay in order to transfer migrants to another Coast Guard cutter.  *Id*. at 45:10-18, 89:16-24.  Again, no evidence was presented as to whether the Coast Guard requested that the DEA or any other agency take custody of Defendants in Guantanamo Bay for purposes of presenting them to a Magistrate Judge in this (or any other) District.

### E.  The Fourth Transfer: From *USCGC Northland* To *USCGC Reliance*

The *Northland* was scheduled to remain in the Windward Pass for approximately one month to maintain the Coast Guard's coverage requirements for the area.  *Id*. at 22:24-23:2. However, on October 20, 2022, the vessel suffered another failure to its sewage system and main engine.  *Id*. at 23:1-5.  That day, the Coast Guard transferred Defendants from the *Northland* to *USCGC Reliance*.  *Id*. at 23:6-10.  Within a day of the transfer, the *Northland* arrived in Guantanamo Bay for repairs.  *Id*. at 89:25-90:5.  Again, there is no evidence in the record regarding whether, before this transfer, the Coast Guard attempted to coordinate with another agency to take custody of Defendants and transfer them out of Guantanamo Bay.

### F.  The Fifth Transfer: From *USCGC Reliance* Back To *USCGC Northland*

In addition to Defendants, the *Reliance* also had 100 Haitian migrants on board who were rescued at sea.  *Id*. at 23:11:14.  The *Reliance* did not have sufficient fuel and food to travel to this District without resupplying, nor could it bring the Haitian migrants to Florida.  *Id*. at 24:1-9.  Thus, six days later, on October 26, 2022, Defendants were transferred while in the Windward Pass from the *Reliance* back to the *Northland*, which had been repaired.  *Id*. at 24:15-16.  Fourteen hours after the transfer, the *Reliance* pulled into Guantanamo Bay.  *Id*. at 46:10-13.  Again, there is no

evidence in the record to explain why the *Reliance* did not bring Defendants to Guantanamo Bay.

### G. The Sixth Transfer: From *USCGC Northland* To *USCGC Charles David Jr.*

The *Northland* remained in the Windward Pass and, on November 1, 2022, Defendants were transferred at sea to *USCGC Charles David Jr.*, which was headed to its home port in Key West, Florida. *Id*. at 27:18-23. At this point, Defendants had been in the custody of the Coast Guard for one month.

### H. The Seventh Transfer: From *USCGC Charles David Jr.* To *USCGC Venturous*

Although the *Charles David Jr.* returned to Key West on November 8, 2023, i*d*. at 27:21-23, 46:24-47:4, Defendants were not on board. Hours before the *Charles David Jr.* arrived in Key West, Defendants were transferred onto another Coast Guard cutter, the *USCGC Venturous*. *Id.* at 28:15-20. The transfer took place approximately 70 nautical miles from the ports in Key West and Miami. *Id*. at 47:5-16. Although it would have been consistent with the Coast Guard guidance (about which Lieutenant Ives testified) to have Defendants remain on the *Charles David Jr*. so that they could be disembarked in Key West, they were again transferred to another vessel at sea. Of course, the port in Key West is in the Southern District of Florida, the district of disposition. Moreover, there is a United States District Court in Key West where Defendants could have had their initial appearance before a Magistrate Judge.

Lieutenant Ives testified that the *Charles David Jr*. did not bring Defendants to Key West because "[w]e did not have the ability to transfer custody in Key West at that time." *Id*. at 28:2-5. He stated that "it is a known issue between the DEA and the Coast Guard" that "[t]he transfer of detainees in Key West is logistically not feasible for DEA because they are strapped for personnel … and strapped for vehicle transport." *Id*. at 28:7-14. He also stated that "it is a very difficult thing for [the DEA] to facilitate with the amount of people and vehicles they have on hand and the

amount of other things in different parts of the area or in the country that are going on at the same time." *Id.* at 74:9-13.  When asked if he had been speaking with the DEA since the date of interdiction, Lieutenant Ives did not give a specific response, instead stating that he has "been speaking to [the DEA] for three years now, and we've never done it out of Key West on my watch." *Id*. at 74:6-8.  In short, it appears that the decision to not bring Defendants into Key West was out of a generalized concern for resources.

Indeed, on this record, it does not appear that any effort was made to assess whether Key West was actually feasible.  For his part, Special Agent Smith testified that "[e]ven if [he] was told to [move Defendants], [he] would keep them in Key West … and let the [U.S.] Marshals [Service] do [the transport]."  Whether the U.S. Marshals service was available is not known given that the Government did not present such evidence.  In fact, the DEA did not realize that presentment was even possible in Key West, as Special Agent Smith testified that did not know "the current status of the magistrate in Key West, if they're holding court down there."  *Id*. at 96:9-11.  There is no other evidence in the record to suggest that disembarking Defendants in Key West was meaningfully explored.

The *Venturous* remained in the Florida Straits as one of four cutters required to patrol the area because of the "unprecedent flow of migration from Cuba to South Florida."  *Id*. at 28:17-24. At the time the *Venturous* assumed custody of Defendants, it already had hundreds of migrants on its deck.  *Id*. at 29:1-2.  The *Venturous* could not bring the migrants into port in the Southern District of Florida, and therefore, another transfer of Defendants had to take place.

    **I.   The Last Transfer: From *USCGC Venturous* Back To *USCGC Northland***

On November 11, 2022, Defendants were transferred in the Florida Straits back onto the *Northland*.  *Id*. at 29:6-7.  In the morning hours of November 11, 2022, the *Northland* finally

arrived at Port Everglades in Fort Lauderdale, Florida with Defendants and eight other detainees on board. *Id*. at 29:17-20, 30:8-10, 48:11-13. The Court was closed because it was a federal holiday, Veterans Day. The DEA took custody of Defendants, who were presented before a Magistrate Judge in Miami, Florida on November 14, 2022 – ***43 days*** after the Coast Guard took them into custody. *Id*. at 75:14-16.

Some of the detainees who arrived on the *Northland*, however, were not being prosecuted by the United States Attorney's Office for the Southern District of Florida but, rather, were facing charges in the Middle District of Florida and the Eastern District of Virginia. *Id*. at 98:5-16. Despite the Coast Guard's policy to bring detainees into the port of disposition, the DEA took custody of the other defendants and arranged for their transportation on land to their district of disposition. *Id*. at 97:24-98:4, 110:19-111:2. Indeed, Special Agent Smith testified that he has "routinely" seen detainees brought to port in the Southern District of Florida who are charged in other districts. *Id*. at 98:19-25.

### J.   Conditions of Confinement

Lieutenant Ives explained the conditions under which detainees are held on Coast Guard cutters. Detainees are asked for their name, identification, and if they have any medical concerns the Coast Guard should be aware of so that care can be provided if needed. *Id*. at 30:24-31:7. Detainees are not interrogated or asked questions regarding criminal activity. *Id*. at 32:8-12. Their clothes are taken for hygienic reasons, and they are provided with a Tyvek jumpsuit, flip flops, and a sun hat. *Id*. at 31:9-23. The Tyvek jumpsuit is waterproof, breathable, and covers the wrist to the ankles, as well as the neck, and has a hood. *Id*. at 77:24-78:2. Any property the detainee has with him is bagged and transferred with the detainee. *Id*. at 72:5-9. They are provided three meals a day and are given playing cards. *Id*. at 31:24-25, 32:12-13. Detainees are given access to

showers and bathrooms upon request, and are offered a shower daily. *Id*. at 32:1-7, 71:1-6.

The Coast Guard supervises the detainees around the clock. *Id*. at 21:23-25. Every three detainees are assigned two "watch standers" who work eight-hour shifts to supervise detainees at all times. *Id*. at 21:24-22:1, 72:17-18. The detainees are kept on deck in a separate part of the cutter for security reasons. *Id*. at 34:22-24. They are shackled at the ankles and are given approximately one hour on deck, unshackled, as long as the detainee is compliant. *Id*. at 34:11, 78:10-12. Detainees are not shackled to the deck unless they pose a security concern to the watch standers or crew. *Id*. at 34:12-14.

## II.     THE INSTANT MOTION

Defendants filed a Motion to Dismiss the Indictment, seeking dismissal with prejudice for four reasons. *See* ECF No. [29]. First, Defendants argue that the Court lacks jurisdiction to adjudicate the offenses alleged in the Indictment because the MDLEA is unconstitutional as applied to Defendants' conduct. *Id*. at 4-9. Defendants contend that Congress's power to enact the MDLEA arises from Article I, Section 8, Clause 10 of the United States Constitution, which is limited to offenses committed on the high seas. Defendants argue that waters located within the Exclusive Economic Zone ("EEZ") of the Dominican Republic, where the interdiction here took place, is not part of the high seas under customary international law. Second, Defendants argue, for purposes of preserving their rights on appeal, that the Court's exercise of personal jurisdiction over them violates Due Process because Congress's Article I authority does not extend to drug trafficking offenses bearing no connection to the United States. *Id*. at 9-11. Third, Defendants assert that the Government violated Rule 5(a) of the Federal Rules of Criminal Procedure because they failed to bring Defendants before a Magistrate Judge "without unnecessary delay." Defendants contend that the Indictment should be dismissed as a sanction for this violation which

constitutes outrageous Government conduct.  *Id*. at 11-15.  Finally, Defendants argue that the Government violated the Speedy Trial Act because an indictment was not issued within 30 days of arrest.  *See* ECF No. [39].  Defendants contend that the Government has not provided adequate justification for the delay between the date they were arrested, which Defendants argue was October 2, 2022 (the date of interdiction), and the date they signed the waiver of preliminary examination (which was fifty-seven days later).  *Id*.

The Government filed a Response challenging each ground of dismissal that Defendants raise.  *See* ECF No. [37].  First, the Government asserts that the MDLEA is not unconstitutional as applied because under Eleventh Circuit precedent, any vessel outside the 12-mile limit of a nation's territorial seas is located on the high seas, even if the vessel is within an EEZ.  *Id*. at 4-14.  Second, the Government argues that Eleventh Circuit precedent is clear that the MDLEA does not require a nexus between a defendant's criminal conduct and the United States, and the absence of such a connection does not violate the Due Process Clause of the Fifth Amendment.  *Id*. at 15-16.  Third, the Government asserts that the delay in presentment was necessary because the Coast Guard experienced operational constraints and emergencies at sea, and the DEA was unable to assume custody of Defendants in Key West.  *Id*. at 16-24.  Finally, the Government contends that for purposes of the Speedy Trial Act, an arrest occurs when an individual is formally charged with an offense.  *See* ECF No. [48].  The Government argues that it did not violate the Speedy Trial Act because Defendants were formally charged by criminal complaint on November 11, 2022, and an indictment was issued nineteen days later, on November 30, 2022.  *Id*.

## III.   ANALYSIS

Pursuant to Federal Rule of Criminal Procedure 12(b), a defendant can move to dismiss an indictment on various grounds, including failure to state an offense, lack of jurisdiction, or for

constitutional reasons.  *See United States v. Kaley*, 677 F.3d 1316, 1325 (11th Cir. 2012).  "[A] court may not dismiss an indictment … on a determination of facts that should have been developed at trial."  *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).  "The sufficiency of a criminal indictment is determined from its face," *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992), and the allegations therein are assumed to be true and are viewed in the light most favorable to the government.  *Torkington*, 812 F.2d at 1354.  Dismissal of an indictment for government misconduct requires the defendant to demonstrate actual prejudice.  *United States v. Ballivian*, 819 F.2d 266, 267 (11th Cir. 1987).

### A. As Applied, The MDLEA Is Constitutional.

Defendants argue that the MDLEA is unconstitutional, as applied, for two reasons: (1) application of the MDLEA exceeds Congress's authority because waters located in EEZs do not constitute "high Seas" under customary international law, and (2) the drug offenses alleged in the Indictment do not have a nexus to the United States.  For the reasons below, both arguments fail.

### 1. The High Seas Include Waters Located in Exclusive Economic Zones.

The Felonies Clause of the U.S. Constitution empowers Congress to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations[.]" U.S. CONST. ART. 1, § 8, CL. 10.   Congress enacted the MDLEA pursuant to the Felonies Clause.  *United States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016) (MDLEA "was enacted under Congress's authority provided by the Felonies Clause ... to define and punish felonies committed on the high seas."); *see also United States v. Estupinan*, 453 F.3d 1336, 1338-89 (11th Cir. 2006) (MDLEA is a constitutional exercise of congressional power under the Felonies Clause).  The Felonies Clause "is textually limited to conduct on the high seas[.]" *United States v. Bellaizac-Hurtado*, 700 F. 3d 1245, 1248 (11th Cir. 2012).  There is no dispute that the

Government apprehended Defendants' vessel approximately 190 miles southwest of La Romana, Dominican Republic, within that nation's EEZ.  As such, the relevant question is whether waters in the Dominican Republic's EEZ constitute the high seas.  Binding Eleventh Circuit precedent and numerous district court decisions in this Circuit dictate that it does.

The high seas are generally understood to constitute "all waters which are neither territorial seas nor internal waters of the United States or of any foreign country."  *United States v. McPhee*, 336 F.3d 1269, 1273 (11th Cir. 2003) (citing 33 C.F.R. § 2.05-1).  "The United States generally recognizes the territorial seas of foreign nations up to twelve nautical miles adjacent to recognized foreign coasts."  *Id*. at 1273.  In *McPhee*, the Eleventh Circuit held that a vessel intercepted outside the twelve-mile Bahamian territorial boundary was "in international waters or at 'high seas' at that time."  *Id*. at 1276.  Although *McPhee* did not address whether a nation's EEZ is part of the high seas, it established that a vessel located beyond territorial waters was at high seas.  Defendants' vessel was seized beyond the twelve-mile territorial limit of the Dominican Republic, and therefore it was in the "high Seas" within the meaning of the Felonies Clause, even though those waters are within the Dominican Republic's EEZ.

Numerous district courts in this Circuit have similarly concluded that a vessel interdicted in a foreign nation's EEZ was in the high seas for purposes of applying the MDLEA.  *See e.g., United States v. Trench*, No. 22-CR-20215, 2022 WL 12307521, at *3 (S.D. Fla. Oct. 17, 2022) (adopted by *Trench*, 2022 WL 13640655 (S.D. Fla. Oct. 21, 2022)) (holding MDLEA applied in EEZ and concluding that "Defendants were undoubtedly captured on the high seas" where vessel seized within Colombia's EEZ, 190 nautical miles from territorial boundary) (collecting cases); *United States v. Mendez*, No. 21-cr-20579-Bloom, 2022 WL 1202889, at *7 (S.D. Fla. April 21, 2022) (relying on *McPhee* to hold that "controlling Eleventh Circuit precedent … define[s] high

seas as all waters seaward of any nation's twelve-mile territorial sea limit, including EEZs."); *United States v. Pierre*, No. 21-CR-20450-Altman, 2022 WL 3042244, at *17-18 (S.D. Fla. Aug. 1, 2022) (denying MDLEA as applied challenge where Defendants were apprehended in the Dominican Republic's EEZ because "the EEZ *is* part of the high seas."); *United States v. Paulino Marte*, No. 22-20162-CR-Scola, 2022 WL 4325053, at *5 (S.D. Fla. Sept. 19, 2022) (denying MDLEA as applied challenge where Defendants were apprehended in the Dominican Republic's EEZ because "consistent with the United Nations … and *McPhee* … a nation's exclusive economic zone does not constitute territorial waters but rather remains part of the high seas.").

Defendants also rely on 33 C.F.R. § 2.32(d), which states that "[u]nder customary international law … high seas means all waters that are not the exclusive economic zone … of the United States or any other nation." *See* ECF No. [29] at 6-7. This argument misses the mark because the pertinent definition of high seas is set forth in § 2.32(c). Section 2.32(c) governs the Coast Guard's interdiction of vessels on the high seas, and it states that "[f]or purposes of 14 U.S.C. § 522[1] … high seas *includes the exclusive economic zones* of the United States and other nations, as well as those waters that are *seaward of territorial seas* of the United States and other nations." (emphasis supplied). Indeed, this regulation only reinforces the conclusion that EEZs are part of the high seas for purposes of the Felonies Clause. *See e.g., Mendez*, 2022 WL 1202889 at *7 (relying in part on § 2.32(c) to conclude that high seas include EEZs); *Pierre*, 2022 WL 3042244 at *18) (same); *Paulino*, 2022 WL 4325053 at *5 (same).

---

[1] This provision addresses the law enforcement authority of the Coast Guard and specifies that "[t]he Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." 14 U.S.C. § 522(a).

### 2. A Nexus Between the Alleged Drug Offenses and the United States is Not Required.

Defendants argue, for purposes of preserving the argument on appeal, that application of the MDLEA is unconstitutional because the offenses alleged in the Indictment have no connection to the United States. *See* ECF No. [29] at 3, 9-11. Defendants contend that such a connection is necessary because Congress's power under the Felonies Clause is limited to offenses that bear a nexus to the United States. Here, too, Defendants' arguments lack merit.

The Eleventh Circuit has repeatedly "held that the MDLEA is a valid exercise of Congress's power under the Felonies Clause as applied to drug trafficking crimes without a 'nexus' to the United States." *United States v. Cabezas-Montano*, 949 F.3d 567, 587 (11th Cir. 2020) (collecting cases). Defendants attempt to avoid this binding precedent by asserting that the Eleventh Circuit "has never ruled on the narrow 'as applied' challenge presented by this case, which is based on the Dominican Republic's interest in regulating its Exclusive Economic Zone." ECF No. [29] at 10. However, this distinction is not persuasive given that the Eleventh Circuit did not base its reasoning on a foreign nation's domestic interest but, rather, on "universal and protective principles [that] support [the] extraterritorial reach" of the MDLEA. *United States v. Campbell*, 743 F.3d 802, 810 (11th Cir. 2014). Specifically, the Eleventh Circuit reasoned that a criminal act does not need a nexus to the United States to be criminalized under the MDLEA because "the trafficking of narcotics is condemned universally by law-abiding nations" and "the protective principle does not require that there be proof of an actual or intended effect inside the United States." *Id*. at 810 (citations omitted).

Defendants also argue that application of the MDLEA is unconstitutional because, absent a nexus between the offenses and the United States, this Court's exercise of personal jurisdiction violates their right to Due Process under the Fifth Amendment. This argument is also foreclosed

by binding precedent. Indeed, the Eleventh Circuit has repeatedly held that "the Fifth Amendment's Due Process Clause does not prohibit the trial and conviction of aliens captured on the high seas while drug trafficking because the MDLEA provides clear notice that all nations prohibit and condemn drug trafficking about stateless vessels on the high seas." *Cabezas-Montano*, 949 F.3d at 587 (citations omitted).

For the foregoing reasons, the undersigned concludes that the MDLEA is not unconstitutional as applied here, and **RECOMMENDS** that the Motion to Dismiss on this basis be **DENIED**.

### B. Although The Government Violated Rule 5(a) of the Federal Rules of Criminal Procedure, Dismissal Of The Indictment Is Not An Available Remedy.

Federal Rule of Criminal Procedure 5(a) provides in pertinent part that "[a] person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." FED. R. CRIM. P. 5(a)(1)(B). The Parties do not appear to dispute that Defendants were "arrested," for purposes of the Rule 5(a) analysis, on the date of interdiction, October 2, 2022. Defendants argue that the Government violated Rule 5(a)(1)(B) because the 43-day delay between their arrest on the high seas and their initial appearance in Miami was unnecessary. *See* ECF No. [29] at 11-13. Defendants further assert that the appropriate remedy for this violation is dismissal of the Indictment with prejudice. *Id*. at 13-15. The Government disputes that the delay was unnecessary, and disputes that dismissal is an available remedy. *See* ECF No. [37] at 16-24. The undersigned addresses each argument in turn.

### 1. The Government Failed to Bring Defendants Before a Magistrate Judge "Without Unnecessary Delay."

The determination whether a defendant was presented without unnecessary delay is based upon a totality of the circumstances. The Advisory Committee notes to Rule 5(a) explain that "[w]hat constitutes 'unnecessary delay,' i.e., reasonable time within which the prisoner should be

brought before a committing magistrate, must be determined in the light of all the facts and circumstances of the case." FED. R. CRIM. P. 5(a) advisory committee's note to 1944 adoption. In *United States v. Purvis*, the Eleventh Circuit provided a non-exhaustive list of factors that a court should consider when making this determination. *Purvis*, 768 F.2d 1237, 1238-39 (11th Cir. 1985). Those factors are: "(1) the distance between the location of the defendant's arrest in international waters and the U.S. port he was brought to; (2) the time between the defendant's arrival at the U.S. port and his presentment to the magistrate judge; (3) any evidence of mistreatment or improper interrogation during the delay; and (4) any reason for the delay, like exigent circumstances or emergencies." *Cabezas-Montano*, 949 F. 3d at 591 (citing *Purvis*, 768 F.2d at 1238-39). The defendant bears the burden to establish that the delay in presentment was unnecessary. *Cabezas-Montano*, 949 F. 3d at 592 n.20.

The second *Purvis* factor is not at issue, and Defendants do not meet their burden on the third *Purvis* factor. Indeed, as to the second factor, the evidence established that Defendants arrived in Port Everglades on Friday, November 11, 2022. *See* ECF No. [49] at 48:11-13. The Court was closed in observance of Veterans Day, and Defendants made their initial appearance before a Magistrate Judge in Miami the next business day, Monday November 14, 2022. *See* ECF Nos. [3], [4], [5]. There was no unnecessary delay between arrival and presentment for an initial appearance, and therefore, this factor weighs in favor of the Government.

As to the third *Purvis* factor, Defendants were not interrogated or mistreated while in the custody of the Coast Guard. They were fed, allowed to tend to their personal hygiene upon request, and given time daily to move about unshackled. The conditions in which Defendants were kept were no doubt difficult, but those conditions were reasonable under the circumstances.

The issue at hand concerns the first and fourth factor: was there a delay, and if so, was the delay unnecessary.  On this record, Defendants have clearly met their burden.  With respect to the first *Purvis* factor, it is undisputed that the interdiction occurred 1,200 nautical miles from Miami. *See* ECF No. [49] at 15:3-7.  Although there was no evidence presented regarding the distance between the location of interdiction and Port Everglades in Fort Lauderdale, Florida (the port where Defendants finally arrived) the undersigned takes judicial notice of the fact that Port Everglades is within the Southern District of Florida and located approximately twenty-seven miles from the Port of Miami.  In short, the distance between these two ports does not change the issue: whether the forty-three days from interdiction to presentment before a Magistrate Judge was reasonable given the distance of roughly 1,200 nautical miles.

The Coast Guard transported Defendants to Port Everglades in forty days, which is a rate of thirty nautical miles per day.  In *Purvis*, the Eleventh Circuit found no unnecessary delay where the government transported the defendants 350 nautical miles in five days, which is a rate of seventy nautical miles per day.  *See Purvis*, 768 F.2d at 1239.  The transportation rate here is more than twice as slow as in *Purvis*, and substantially slower than found reasonable in other cases in this Circuit.  *See e.g., United States v. Barros*, No. 21-cr-20438-Bloom, 2022 WL 1135707, at *8 (S.D. Fla. April 18, 2022) (delay reasonable where government transported defendants from point of interdiction to port at rate of 148 nautical miles per day); *United States v. Perez*, No, 8:20-cr-83-T-36JSS, 2020 WL 9554484, at *11 (M.D. Fla. Nov. 3, 2020) (finding first *Purvis* factor neutral where defendants transported at rate of 133 nautical miles per day).  Indeed, the Government presented no case where this rate of travel was found to be reasonable by any court.  Given the painfully slow pace of travel, the undersigned finds that the first *Purvis* factor weighs against the Government and turns to consider the reasons for the delay (the fourth *Purvis* factor).

Contrary to the Government's assertions in its Response, there was no emergency or exigent circumstances that explains why it took so long for Defendants to arrive in Miami. The pace was not dictated by unforeseen mechanical delays,[2] nor was it caused by any emergency or act of nature (i.e., a hurricane). Nor were the demands placed on the Coast Guard by the recent migrant crisis the cause for delay. Although the exodus of migrants from Haiti and Cuba limited the ability of Coast Guard vessels to leave the Caribbean, the evidence here established that the Coast Guard removed Defendants from vessels *hours* before those very vessels were arriving on U.S. soil simply because they were not able to coordinate land transportation for Defendants. This happened *eight* times. Indeed, Defendants did not disembark in Puerto Rico or Guantanamo Bay or Key West because the Coast Guard could not secure their transportation on land. This is particularly striking given that Defendants could have made their initial appearances in either Puerto Rico or Key West given that both have U.S. District Courthouses with at least one Magistrate Judge available. As Circuit Judge Rosenbaum noted in her concurrence in *Cabezas-Montano* when commenting on "the Coast Guard's apparent seven-week odyssey" in bringing defendants before a Magistrate Judge, "if the government could have delivered the defendants to a closer jurisdiction in less time, it seems to me that Rule 5(a)(1)(B) required it to do so – regardless of the fact that 46 U.S.C. § 70504(b)(2) allows an MDLEA offender to 'be tried in any district,' 'if the offense was begun or committed upon the high seas'." *Cabezas-Montano*, 949 F.3d at 614.

It is clear that the Government could have brought Defendants within the jurisdiction of the United States in significantly less time and failed to do so. The reason they did not – which was generally presented to the Court as the Government's lack of resources to transport Defendants

---

[2] Coast Guard vessels routinely experience mechanical failures, which Lieutenant Ives described as "going on since Alexander Hamilton …." *Id*. at 82:19-25.

– is simply not sufficient evidence to find that the delay was not unnecessary.  Specifically, Lieutenant Ives testified that the Coast Guard is reluctant to bring detainees to a port other than the port of disposition out of concern that other agencies may not have the manpower to handle them because "[t]he personnel hurdle is a huge one." 67:17-18.  Lieutenant Ives further testified that the Coast Guard does not have a policy requiring that detainees be brought to the nearest federal courthouse because "[t]hat would be forcing the hand of other agencies that aren't the Coast Guard, because we can't maintain custody over land." *Id*. at 76:6-12.  Indeed, other than a reference to a request for "a plane," there was little evidence of requests for transportation even being made. Nevertheless, even assuming that requests to transport Defendants were made before the very vessels they were on reached a U.S. port, there is no evidence as to *why* those requests were denied. And then, if we assume that they were made and each was denied based on a lack of resources, that would still hardly be enough evidence to find that the forty-three day delay was necessary.

 For example, requests could have been denied because an agency was involved with another law enforcement operation that it deemed a priority, or it could have been denied because an agency simply had no interest in expending its resources at that time.  Clearly, the latter could not support a finding that the delay was necessary.  Here, the witnesses testified about a reluctance to upset another agency by making a request for transportation, and one witness even testified that he was unsure of whether a Magistrate Judge was available in Key West to hold initial appearances. Those reasons, too, are not sufficient.  Resources are not limitless, and federal agencies are charged with making difficult decisions about their resources every day.  But when the law requires that their decisions be made by a certain legal standard, they are obligated to present sufficient evidence if they expect a Court to find that their delay was in keeping with the rules.

 Although the Court does not conclude that a certain number of days is presumptively

unnecessary nor that a lack of resources may not be a legitimate reason for a delay, a generalized lack of resources *alone* is not sufficient when the delay is as significant as the one here, and there were multiple opportunities to present Defendants without delay.[3]   The Court is mindful of the strain that the Coast Guard is under to care for detainees, migrants and other persons that might for a number of reasons fall under their care.   No doubt, the Coast Guard has little to no interest in keeping detainees in their custody longer than necessary.   The DOJ might also be motivated to proceed with its prosecution as quickly as possible given that no further fact finding is generally necessary in these kinds of cases.   However, whether the delay was in good faith is not the standard under Rule 5(a).   The standard is that the Government must bring defendants to a Magistrate Judge without "unnecessary" delay.   Generalized descriptions of bureaucratic inconveniences are not sufficient to find that a delay of this length, coupled with multiple opportunities to present Defendants before a Magistrate Judge weeks before actually doing so, comports with Rule 5(a). Accordingly, the undersigned finds that the fourth *Purvis* factor weighs decisively against the Government.

Based upon the totality of the circumstances and consideration of the *Purvis* factors, the undersigned concludes that the Government violated Rule 5(a)(1)(B) by failing to present Defendants before a Magistrate Judge without unnecessary delay.[4]

---

[3] Surprisingly, it appears that the lengthy delay in the case is the norm rather than the exception. Lieutenant Ives testified that the *average* time it now takes the Coast Guard to bring a detainee to the port of disposition is *twenty- four to forty-five days*. *See* ECF No. [49] at 81:23.   This testimony, coupled with the generic reasons offered for the delay, leaves the impression that little to no consideration is being given to the amount of time that detainees are being held by the Coast Guard.

[4] Defendants also argue that the Government violated Rule 5(b) by failing to obtain a probable cause determination by a Magistrate Judge within 48 hours of their arrest.   *See* ECF No. [29] at 12-13.   This argument is without merit.   Rule 5(b) provides that "[i]f a defendant is arrested without a warrant, a complaint meeting Rule 4(a)'s requirement of probable cause must be promptly filed in the district where the offense was allegedly committed." FED. R. CRIM. P. 5(b).   Defendants

**2.  *Dismissal Of The Indictment Is Not An Available Remedy For The Government's Violation of Rule 5(a).***

Having determined that the Government did not take Defendants before a Magistrate Judge without unnecessary delay, the next question is what remedy, if any, can Defendants obtain.  The remedy for violation of Rule 5(a) is not prescribed by statute, nor is it set forth in the Federal Rules of Criminal Procedure.  Indeed, the remedy, suppression of evidence, was judicially created.  As the Eleventh Circuit explained:

> In Mallory v. United States, the Supreme Court indicated that the purpose of Rule 5(a) is to prevent oppressive police interrogations and other "third degree" tactics before bringing the accused in front of an officer of the court; the remedy was the exclusion of evidence which was gained during the delay by the use of such tactics.

*Cabezas-Montano*, 949 F.3d at 591; *see also United States v. Carruthers*, 458 F. App'x 811, 818 (11th Cir. 2012) ("The purpose of Rule 5 is to have a judicial officer advise the defendant of his constitutional rights and thereby to prevent administrative detention without probable cause and to reduce the opportunity for third-degree practices.") (quoting *United States v. Mendoza*, 473 F.2d 697, 702 (5th Cir. 1973)).  As such, "[t]he only remedy [the Eleventh Circuit] has recognized for a violation of Rule 5(a) is the suppression of evidence obtained as a result of the violation." *Carruthers*, 458 F. App'x at 818 (citation omitted).

Here, of course, that remedy is an empty one because no evidence was gathered against Defendants during the delay.  Although Defendants argue that dismissal of the Indictment is warranted, they do not cite any cases in this Circuit where a court dismissed an indictment based

---

recognize that Rule 5(b) stems from the Fourth Amendment's protection against unreasonable seizures.  *Id*. at 13.  However, the Fourth Amendment "does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters." *Cabezas-Montano*, 949 F. 3d at 593. Defendants are non-citizen/non-resident aliens arrested in international waters and, therefore, the promptness requirement of Rule 5(b) is inapplicable.  *See also Barros*, 2022 WL 1135707 at *8.

upon a violation of Rule 5(a), and the undersigned has not located any such authority.

As noted above, the Government must present evidence describing the efforts it made to comply with the dictates of Rule 5(a)(1)(B).  Although its failure to do so here is troubling, the fact that the Court is powerless to do more should not make these delays acceptable.  As Judge Rosenbaum noted in her concurrence in *Cabezas-Montano,* "at a minimum, the United States should give some serious consideration to its procedures for presenting an MDLEA detainee arrested in international waters.  In the absence of a very good reason, detaining a person on the high seas for seven weeks before formally charging him with a crime is just wrong." *Cabezas-Montano*, 949 F.3d at 617.  The Government's apparent disregard for the length of time between an MDLEA detainee's apprehension and presentment is wrong, but binding precedent instructs that the only remedy recognized for violation of Rule 5(a) is suppression of evidence.  Unless and until the Supreme Court or Eleventh Circuit says otherwise, dismissal is not an option.

Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss the Indictment for violation of Rule 5(a)(1)(B) be **DENIED**.[5]

### C.  The Government Did Not Violate the Speedy Trial Act

The Speedy Trial Act, 18 U.S.C. § 3161(b), "requires the government to file an indictment or information against a defendant within thirty days from the date on which he was arrested or served with a summons."  *United States v. Bocanegra*, 631 F. App'x 871, 873 (11th Cir. 2015) (citation omitted).  The dispute here centers on what is the date of Defendants' "arrest" for

---

[5] Defendants also argue that the Indictment should be dismissed as a sanction for outrageous government conduct.  *See* ECF No. 29] at 13-14.  This is not a viable basis for dismissal in the Eleventh Circuit.  *See United States v. Cannon*, 987 F.3d 924, 942 (11th Cir. 2021) ("[B]ecause this Court has never actually reversed a conviction based on outrageous government conduct, any discussion of it is merely dicta."). The doctrine is also inapplicable because, even if recognized in this Circuit, "the actionable government misconduct must relate to the defendant's underlying or charged criminal acts."  *United States v. Jayyousi*, 657 F.3d 1085, 1112 (11th Cir. 2011).

purposes of the Speedy Trial Act.  Defendants argue that they were arrested on October 2, 2022, the date of interdiction, yet did not sign a waiver of preliminary examination until 57 days later, on November 28, 2022, in violation of the Speedy Trial Act's 30-day deadline.  *See* ECF No. [39].  However, Defendants do not cite any legal authority to support their position that the Speedy Trial Act clock begins to run in MDLEA cases on the date of interdiction.

The Government, by contrast, argues that Defendants were arrested on November 11, 2022, the date they were formally charged by criminal complaint, and an indictment was issued on November 30, 2022, nineteen days later, in compliance with the Speedy Trial Act.  *See* ECF No. [48].  The Government is correct.  "[T]he Eleventh Circuit has repeatedly determined over the past forty years that, for purposes of the Speedy Trial Act, an 'arrest' occurs when an individual is "formally charged with an offense."  *United States v. Santana*, No. 22-cr-20220, 2022 WL 16845104, at *7 (S.D. Fla. Nov. 9, 2022) (citing *United States v. Kubiak*, 704 F.2d 1545, 1548 (11th Cir. 1983) (affirming denial of motion to dismiss indictment where defendants "were never taken before a federal magistrate; nor were federal charges ever lodged against the appellants in a complaint"); *United States v. Noel*, 231 F.3d 833, 836 (11th Cir. 2000) ("[T]he time period for the Speedy Trial Act should begin to run only after an individual is 'accused,' either by an arrest and charge or by an indictment."); *United States v. Keel*, 254 F. App'x 759, 761 (11th Cir. 2007) (noting that the Act "only applies to an individual who has been formally charged with an offense").  Given the clear precedent in this area, Defendants were arrested on November 11, 2022, and as such, no Speedy Trial right has been violated.  *See e.g., Santana*, 2022 WL 16845104, at *7 (in MDLEA case, holding that "Defendants were arrested for Speedy Trial Act purposes on May 13 [date on which they were formally charged] and, because their indictment was entered on May 27 (a gap of fourteen days), the Act was not violated."); *Delgado-Pachay v. United States*, No. 8:20-cv-154-

T-02JSS, 2020 WL 1820506, at *4 (M.D. Fla. April 10, 2020) (in MDLEA case, recognizing that "for purposes of the Speedy Trial Act, an 'arrest' does not occur merely because a defendant is seized and taken into temporary custody.") (citations omitted).

For these reasons, the undersigned concludes that the Government did not violate the Speedy Trial Act and **RECOMMENDS** that Defendants' Motion to Dismiss on this basis be **DENIED.**

## IV.     CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that Defendants' Motion to Dismiss Indictment, ECF No. [29], be **DENIED**.

## V.     OBJECTIONS

In light of the upcoming calendar call, and given that the Court provided the parties ample time to present oral argument and allowed for supplemental briefing, the parties will have until **March 16, 2023** within which to file written objections, if any, for consideration by the United States District Judge.  Any request for an extension of this deadline must be made by **close of business on March 10, 2023**.  Pursuant to Fed. R. Crim. P. 59(b), Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND SUBMITTED** in Chambers in Miami, Florida on March 9, 2023.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**